

FILED

Mar 19 2019, 7:47 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

James A. Masters
Nemeth, Feeney, Masters & Campiti,
P.C.
South Bend, Indiana

ATTORNEY FOR APPELLEE
CINDY ANN KOBOLD

Robert J. Palmer
May Oberfell Lorber
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE-
INTERVENOR WELLS FARGO
BANK, NATIONAL
ASSOCIATION

Jared C. Helge
Andrew L. Palmison
Rothberg Logan & Warsco LLP
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE-
INTERVENOR RIETH-RILEY
CONSTRUCTION CO., INC.,

Robert G. Devetski
Mark J. Adey
Barnes & Thornburg LLP
South Bend, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James Peter Kobold,

*Appellant-Respondent,*

v.

Cindy Ann Kobold,

*Appellee-Petitioner,*

and

Wells Fargo Bank, National Association and Rieth-Riley Construction Co., Inc.,

*Appellees-Intervenors.*

March 19, 2019

Court of Appeals Case No. 18A-DR-893

Appeal from the St. Joseph Circuit Court

The Honorable John E. Broden, Judge

The Honorable William L. Wilson, Magistrate

Trial Court Cause No. 71C01-1404-DR-224

**Kirsch, Judge.**

[1] To divide their marital assets, James Peter Kobold ("James") and Cindy Ann Kobold (Hiatt) ("Cindy") entered a property settlement agreement ("PSA"), agreeing that James would keep their 175-acre farm and that James would pay Cindy an equalization payment of $319,122.04 through installment payments that would run through June of 2020. James signed a promissory note in which he agreed that Cindy could sell marital assets if he breached the PSA. After the dissolution was final, James failed to make any installment payments, and Cindy obtained the trial court's permission to sell the farm. She subsequently sold the farm to Rieth-Riley Construction Co., Inc. ("Rieth-Riley") for $1.63 million. James filed a motion to correct error, which the trial court denied in part by affirming its earlier decision to let Cindy sell the farm and by denying

James's request to rescind the sale. The trial court granted James's motion in part by ruling that Cindy could keep no more of the sale proceeds than was necessary to pay the amount due to her under the promissory note at the time the sale to Rieth-Riley had closed.

[2] On appeal, James raises the following issues:

> I. Whether the trial court abused its discretion in denying James's motion to correct error, in part, by:
>
>> A. finding that Cindy held a judgment lien against the farm and thus it impermissibly modified the PSA; and
>>
>> B. denying James's motion to rescind the sale to Rieth-Riley;
>
> II. Whether the trial court adequately adjudicated whether Rieth-Riley had the right to possess the farm.

On cross-appeal, Cindy raises the following issues:

> I. Whether trial court erred in limiting Cindy's recovery to only the amount James owed her under the promissory note at the time the sale to Rieth-Riley had closed; and
>
> II. Whether this court should remand the matter to the trial court for an assessment of Cindy's trial and appellate attorney fees.

We affirm in part, reverse in part, and remand.

## Facts and Procedural History

[3] James and Cindy were married in 1996. *Appellant's App. Vol. 2* at 49. The marital property included several parcels of farm land that totaled 175 acres. *Id.* at 32, 93. Wells Fargo Bank, National Association ("Wells Fargo") held two mortgages on two parcels of the farm, secured by one mortgage recorded on August 20, 2003, and another mortgage recorded on May 15, 2013.[1] *Id.* at 20-21.

[4] James and Cindy separated in August of 2014. *Id.* at 49. The PSA, filed in May of 2016, provided that James would receive the 175-acre farm. *Id.* at 32, 93, 95. To equalize the property division, James executed a non-negotiable promissory note to pay Cindy $319,122.04. *Id.* at 52. The promissory note set out the following payment schedule:

> a) $20,000.00 upon the closing of the refinancing of [James's] farming and transportation businesses, but in no event later than 90 days
>
> b) $40,000 on or before January 15, 2017.
>
> c) $40,000 on or before May 1, 2017.

---

[1] James seeks no relief from Wells Fargo, explaining that he does not intend to affect "the satisfaction of the mortgages on the real estate to Wells Fargo Bank or the other lien creditors whose debts were paid and liens discharged at the closing of the sale of the real estate or to ask this Court to grant any relief against Wells Fargo bank." *James's Br.* at 16. Wells Fargo acknowledges this and states that it files its brief solely to reserve its rights and remedies if we order Wells Fargo to disgorge the proceeds from the sale of the farm to Rieth-Riley. *Wells Fargo Br.* at 15. Thus, we have no issues to resolve as to James and Wells Fargo.

d) $2,000 per month beginning June 1, 2017 through May 1, 2020.

e) The remaining principal balance and all accrued interest by June 1, 2020.

*Id.* at 59. The PSA said that if James failed to "abide by a term of repayment set forth in the Promissory Note, then [Cindy] shall have the right to sell assets to satisfy said repayment." *Id.* at 52. However, the promissory note also said that James had the right to dispose of marital assets: "Notwithstanding any other provision in this Agreement to the contrary, [James] shall be entitled to sell, convey or otherwise dispose of any assets." *Id.* at 57. In the event of a default by James, the promissory note stated that Cindy "shall be entitled to recover reasonable attorneys' fees incurred in collection." *Id.* at 60.

[5] James and Cindy defaulted on the mortgage payments, and pursuant to Wells Fargo's request, the trial court foreclosed the mortgages on December 21, 2016. *Appellee Rieth-Riley App. Vol. 2* at 38-43; *Wells Fargo Br.* at 5. Even so, Wells Fargo did not file a praecipe for a sheriff's sale of the farm. *Appellant's App. Vol. 2* at 33.

[6] James failed to make any installment payments to Cindy as required under the promissory note. *Id.* at 19. On November 1, 2016, nearly three months after James's first payment on the promissory note was due, Cindy filed a motion to sell marital assets, seeking permission from the trial court to sell the farm to satisfy the equalization payment. *Id.* at 64. Ten months later, the trial court

heard the motion and granted it. *Id.* at 18-22. Cindy sold the farm to Rieth-Riley. At the time of the sale, the farm's appraised value was $1.56 million, but Cindy sold it for more, $1.63 million. *Id.* at 13, 104.

[7] After Cindy sold the farm, she filed a motion for possession of real estate. On December 6, 2017, the magistrate ordered James to make the marital real estate "available to Wells Fargo, Rieth Riley or to any parties designated by those entities to review and inspect the premises. . . ." *Appellant's App. Vol. 2* at 10. The order also provided that James "acknowledges that the real estate is subject to a Buy and Sell Agreement and that [he] will cooperate in the sale of the real estate, including vacating the premises at the time of the closing of that sale." *Id*.

[8] On December 21, 2017, the day before the sale was to close, James moved to stay the sale, claiming he had found other buyers who would pay $1 million for 100 acres of the farm. *Id.* at 65-67, 94. At the December 22, 2017 hearing on James's motion, James's counsel presented a written purchase agreement from neighboring farmers who proposed to buy the land and alleged they were ready to close the purchase as soon as the closing documents could be prepared. *Id.* at 94. James said the proposed sale would let him keep seventy-five acres of the farm, including his house and outbuildings, and that it would generate enough funds to pay Wells Fargo, other lien-creditors, and Cindy at least $200,000.00. *Id.* at 94-95. James advised the trial court that he owned farm equipment valued at $300,000.00 that he could sell at auction at the end of January 2018 to pay any remaining amount due to Cindy. *Id.* at 95.

[9] The trial court denied the motion to stay the same day the hearing was held and allowed the closing of the sale to proceed. *Id.* at 11, 24-25. In so ruling, the trial court found "that the evidence is overwhelming and uncontroverted that [James] is in default of the terms and conditions of the agreed upon Property Settlement Agreement signed and filed with this Court on May 12, 2016." *Id.* at 24. The trial court also adopted and approved the September 21, 2017 order, previously entered only by the magistrate. *Id.* at 24-25. The sale to Rieth-Riley closed later that day. *Id.* at 32.

[10] On January 22, 2018, James filed a motion to correct error, alleging that the trial court erred in letting Cindy sell the farm, so she could get the full equalization payment before the payment schedule set forth in the promissory note had transpired. *Id.* at 74-84. James's motion also asked the trial court to rescind the sale to Rieth-Riley. *Id.* Per the trial court's authorization, on January 24, 2018, Rieth-Riley intervened and moved to eject James from the marital property, where he had continued to reside, even after Rieth-Riley had bought the property. *Id.* at 11; *Appellee Rieth-Riley's App. Vol. 2* at 21-25. On February 16, 2018, James filed a motion to strike Rieth-Riley's request to eject him. *Appellant's App. Vol. 2* at 12.

[11] On March 12, 2018, the trial court denied James's motion to correct error in part and granted it in part. *Id.* at 31-41. It granted it in part by concluding that the promissory note did not contain an acceleration clause, and therefore, Cindy was entitled to recover only what she was owed under the promissory note on the date that the sale to Rieth-Riley had closed, December 22, 2017. *Id.*

at 40. At the same time, however, the trial court ruled that Cindy had a judgment lien on the farm, that she would not have been able to deliver marketable title to the farm unless she released her judgment lien at the time of closing, and that she would not have done so unless she had been paid in full. *Id.* at 40-41. Nonetheless, the trial court found that James "has raised a valid question concerning the calculation of the amount that was paid to [Cindy] from the proceeds, particularly concerning the interest added to the principal. [James] is entitled to ensure that the amount paid to [Cindy] was correct and that any erroneous overpayment is returned to him." *Id.* at 41.

[12]   On March 14, 2018, the trial court granted Rieth-Riley's motion for ejectment and immediate possession, ruling that Rieth-Riley was entitled to immediate possession of the farm where James had still been residing. *Appellee Rieth-Riley App. Vol. 2* at 70-72. On March 20, 2018, Rieth-Riley filed a motion for final judgment of possession. *Id.* at 73. On March 30, 2018, the trial court granted Rieth-Riley final possession of the farm. *Appellant's App. Vol. 2* at 46-48.

[13]   After Wells Fargo and other creditors were paid[2] off from the sale of the farm, the remaining proceeds were distributed to Cindy and James, with Cindy receiving $383,123.09 and James receiving $500,000.00. *Rieth-Riley Br.* at 12; *James's Br.* at 14, n.2.

---

[2] Wells Fargo received $695,000.00, and other creditors received approximately $80,000.00. *Appellant's App. Vol. 2* at 82.

On April 23, 2018, James asked this court to stay enforcement of the final judgment of possession, and on May 21, 2018, we denied the request. James now appeals, and Cindy brings a cross appeal.

# Discussion and Decision

## James's Appeal

## I.   Motion to Correct Error Ruling

James argues that the trial court's motion to correct error ruling was erroneous because 1) it incorrectly found that Cindy held a judgment lien against the farm; 2) in letting Cindy sell the farm, it impermissibly modified the PSA; and 3) it wrongly denied James's request to rescind the sale, which James had raised in his motion to error. We will address these first two claims in the Section A, immediately below, and the rescission claim in Section B.

We review a trial court's ruling on a motion to correct error for an abuse of discretion. *Inman v. Inman*, 898 N.E.2d 1281, 1284 (Ind. Ct. App. 2009). An abuse of discretion occurs if the trial court's decision is against the logic and effect of the facts and circumstances before the court or if the court has misinterpreted the law. *Id.*

### A. Cindy Held a Judgment Lien and Trial Court Did Not Modify the PSA

James contends the trial court erred in ruling that Cindy held a judgment lien against the real estate pursuant to Indiana's judgment lien statute (Indiana Code Section 34-55-9-2) instead of holding a narrower secured interest pursuant to

the PSA and the dissolution security statute (Indiana Code Section 31-15-7-8). He argues that from this erroneous determination, the trial court impermissibly modified the PSA by letting Cindy sell the farm to get the full equalization payment.

[18] We apply the following principles when reviewing a property settlement agreement:

> An agreement for division of property is economic in nature - an ordinary contract. Courts therefore interpret . . . settlement agreements using ordinary contract principles. Thus, the goal of courts in interpreting a settlement agreement is to ascertain and give effect to the parties' intent. Rules of contract construction and extrinsic evidence may be employed in giving effect to the parties' reasonable expectations. When a contract's terms are ambiguous or uncertain and its interpretation requires extrinsic evidence, its construction is a matter for the fact-finder. Hindsight tells us that the parties could have negotiated terms to resolve the present dispute, but they did not. Thus, the courts are left to divine their likely intent.

*Johnson v. Johnson*, 920 N.E.2d 253, 256 (Ind. 2010) (internal citations omitted).

[19] In more specific terms, James argues the trial court erred in finding that the dissolution decree gave Cindy a judgment lien on the farm and that such a lien gave Cindy the right to refuse to release the judgment lien unless she was paid in full on the promissory note. James concedes that in a dissolution case, when one party receives a money judgment against the other, the general judgment lien statute creates an automatic lien on the indebted party's real estate. *See Franklin Bank & Tr. Co. v. Reed*, 508 N.E.2d 1256, 1258-59 (Ind. 1987). James

correctly observes that a trial court can overcome a judgment lien if it makes an explicit finding that a settlement agreement creates a security interest under Indiana Code section 31-15-7-8. *See Reed*, 508 N.E.2d at 1259.

[20] James argues that the trial court's erroneous ruling that Cindy held a judgment lien was the root of its erroneous decision to let Cindy sell the farm to get the full equalization payment. Because the promissory note did not not include an acceleration clause, James argues that Cindy was entitled to no more than the amount James was in default according to the payment schedule in the promissory note. *See Hamlin v. Stewart*, 622 N.E.2d 535, 539 (Ind. Ct. App. 1993) (absent an acceleration clause, the holder of a note can collect only the payments due at the time of default and as each installment payment becomes due). James also argues that allowing Cindy to sell the real estate violated his right to sell marital assets, which he alleges superseded Cindy's right to sell the assets, even though he had breached the terms of the promissory note. In support, he recites the following language from the promissory note: "Notwithstanding any other provision in this Agreement to the contrary, [James] shall be entitled to sell, convey or otherwise dispose of any assets." *Appellant's App. Vol. 2* at 57. Because of his purported unqualified right to sell the real estate, James further asserts the trial court abused its discretion in denying his proposed sale of 100 acres of the farm to neighboring farmers. That proposed sale, he contends, would have provided enough funds to pay Wells Fargo, other creditors, and Cindy the amount he owed her at the time, though not the full equalization payment. James argues that in making these erroneous

rulings, the trial court impermissibly modified the PSA. *See Johnson*, 920 N.E.2d at 258 (property distribution settlements approved as part of a dissolution may be modified only where both parties consent or where there is fraud, undue influence, or duress).

[21] Addressing James's arguments requires us to determine if Cindy held a judgment lien against the farm, as the trial court found, or if she held a narrower secured interest, which was defined and limited by both the PSA and the dissolution security statute. The judgment lien statute provides as follows:

> All final judgments for the recovery of money or costs in the circuit court and other courts of record of general original jurisdiction in Indiana, whether state or federal, constitute a lien upon real estate and chattels real liable to execution in the county where the judgment has been duly entered and indexed in the judgment docket as provided by law:
>
> (1) after the time the judgment was entered and indexed; and
>
> (2) until the expiration of ten (10) years after the rendition of the judgment;
>
> exclusive of any time during which the party was restrained from proceeding on the lien by an appeal, an injunction, the death of the defendant, or the agreement of the parties entered of record.

Ind. Code § 34-55-9-2. The dissolution security statute provides: "Upon entering an order under this chapter, the court may provide for the security, bond, or other guarantee that is satisfactory to the court to secure the division of property." Ind. Code § 31-15-7-8.

[22] In dissolution cases, we presume that the judgment lien statute applies unless the trial court explicitly states otherwise. *Reed*, 508 N.E.2d at 1259; *Penix v. Hicks*, 618 N.E.2d 1346, 1347 (Ind. Ct. App. 1993). In *Reed*, the Indiana Supreme Court held that where one party receives a money judgment against the other party, the judgment lien statute creates an automatic lien on the indebted party's real estate. 508 N.E.2d at 1258-59. This is so even when one spouse is ordered to pay the other spouse in installments. *Lobb v. Hudson-Lobb*, 913 N.E.2d 288, 295 (Ind. Ct. App. 2009); *see also Needham v. Suess*, 577 N.E.2d 965, 968 (Ind. Ct. App. 1991) ("The statute does not differentiate between a judgment which is to be paid in installments and one which is to be paid in one lump sum.").

[23] The judgment lien statute applies automatically unless a trial court takes "positive action" to alter application of the judgment lien statute. *Johnson*, 920 N.E.2d at 256. In other words, to avoid application of the judgment lien statute, a trial court must use language that "*specifically eliminate[s]*" application of that statute. *See Reed*, 508 N.E.2d at 1259 (emphasis added); *see also Lobb*, 913 N.E.2d at 295; *Penix*, 618 N.E.2d at 1347. "[S]ilence of the court does not eliminate the automatic provision in the judgment lien statute. The court may exercise its inherent power and eliminate a judgment lien only by positive action." *Reed*, 508 N.E.2d at 1259.

[24] James argues that the trial court did, in fact, take positive action to specifically eliminate the judgment lien when it had earlier merged the PSA into the

dissolution decree. *Appellant's App. Vol. 2* at 63. Thus, he claims Cindy's secured interest was limited to only a part of the equalization payment.

[25] We addressed what it means to "specifically eliminate" application of the judgment lien statute in *Bell v. Bingham*, 484 N.E.2d 624, 627-628 (Ind. Ct. App. 1985). *See Reed*, 508 N.E.2d at 1259. In *Bell*, more than two years after the former wife died, the former husband, who had been awarded alimony, sued the purchasers of the former wife's real estate. The former husband claimed he held a judgment lien against the real estate. In rejecting this claim, and in finding that the trial court took "positive action" to alter application of the judgment lien statute, *Bell* cited the following language from the divorce decree: "[T]he . . .real estate . . . [is] set over to [former wife] . . . [and] will be turned over to her as her sole property and that [former husband will] *have no further interest in said real estate whatsoever*." *Id.* at 625-26 (emphasis in original). Thus, *Bell* ruled that because the trial court explicitly withheld a lien pursuant to the dissolution security statute, the former husband did not have a general judgment lien against the real estate. *Id*. at 627.

[26] Unfortunately, the language in the motion to correct error ruling is unclear as to whether Cindy had a judgment lien or a lien pursuant to the dissolution security statute:

> Notably, the parties did not specify whether, upon default under the terms of the promissory note, [Cindy] had authority to collect the entire amount to which she was entitled or whether her recovery would be limited to only the amount unpaid at the time of default. [James's] point that the promissory note (which does

indeed appear to have been cobbled together from various sources) lacks an acceleration clause is meritorious. The Court concludes that [Cindy] was entitled to recover only the moneys owed to her that had not been paid as of the date of closing on December 22, 2017.

Having reached this conclusion, the Court must determine what relief is available to [James]. Unfortunately, it appears that little relief is available. With the entry of the dissolution decree, a judgment lien would have (or at least should have) appeared on the 175 acres of land. [Cindy] and [James] would not have been able to deliver marketable title to the land unless [Cindy] released her judgment lien at the time of closing. [Cindy] has argued via her counsel that she would not have done so if she had not been paid in full. At the same time, however, [James] has raised a valid question concerning the calculation of the amount that was paid to [Cindy] from the proceeds, particularly concerning the interest added to the principal. [James] is entitled to ensure that the amount paid to [Cindy] was correct and that any erroneous overpayment is returned to him.

*Appellant's App. Vol. 2* at 40-41.

[27] Here, the ambiguity of this language is irrelevant because we presume a judgment lien exists unless a trial court uses language that "specifically eliminate[s]" application of the judgment lien statute. *See Reed*, 508 N.E.2d at 1259. "The court may exercise its inherent power and eliminate a judgment lien only by positive action." *Id.* Here, there is no language that specifically eliminates application of the judgment lien statute. *See Appellant's App. Vol. 2* at 31-41; 49-58; 61-63. Nowhere did the trial court take "positive action" to alter application of the judgment lien statute. *See Johnson*, 920 N.E.2d at 256; *Reed*,

508 N.E.2d at 1259.  Indeed, even though the trial court's ruling creates some confusion, it did state that the dissolution decree granted Cindy a judgment lien.  *Appellant's App. Vol. 2* at 40-41.

[28]     The parties could have clarified their intent by including language in the PSA that explained whether Cindy held a judgment lien or a dissolution security interest.  They did not do so.  As the trial court observed:  "Notably, the parties did not specify whether, upon default under the terms of the promissory note, [Cindy] had authority to collect the entire amount to which she was entitled or whether her recovery would be limited to only the amount unpaid at the time of default."  *See Joyce v. Joyce*, 627 N.E.2d 825, 828 n.1 (Ind. Ct. App. 1994) ("We would encourage the inclusion of such language in settlement agreements and dissolution decrees so as to avoid confusion regarding the application of the judgment lien statute and/or the security for payment statute and to show the clear intent of the parties."), *trans. denied*.  The fact that the PSA called for installment payments did not obviate the need for a clear statement about the nature of Cindy's security interest.  *See Reed*, 508 N.E.2d at 1258-59 (dissolution decree automatically creates judgment lien against indebted party's real estate even if indebted party is ordered to pay the other spouse in installment payments); *see also Lobb*, 913 N.E.2d at 295.

[29]     Therefore, we find that Cindy held a judgment lien against the farm.  A judgment lien confers title to real estate to the judgment lien holder.  *Cf. Rural Acceptance Corp. v. Pierce*, 157 Ind. App. 90, 97, 298 N.E.2d 499, 503 (1973).  A judgment lien "gives the judgment creditor the right to attach the judgment to

the debtor's property." *Judgment Lien,* Black's Law Dictionary (10th ed. 2014). Here, the judgment lien empowered Cindy to sell the farm to procure the full amount of the equalization payment.

[30] Because we find that Cindy held a judgment lien against the farm, the lack of an acceleration clause in the PSA is irrelevant; that absence had no bearing on Cindy's right to seek full payment of the equalization payment or to sell the entire farm. Our finding also renders meritless James's claim that the trial court abused its discretion in denying his request to sell 100 acres of the farm to neighboring farmers. As holder of a judgment lien, Cindy, not James, had the right to negotiate a sale of the real estate. Our finding also disposes of James's claims that the PSA gave him the unqualified right to sell the real estate even though he had defaulted under the terms of the promissory note. ("Notwithstanding any other provision in this Agreement to the contrary, [James] shall be entitled to sell, convey or otherwise dispose of any assets.")[3] *Appellant's App. Vol. 2* at 57. Once again, Cindy's judgment lien supersedes whatever rights this language may have conferred upon James.

[31] Finally, we observe that James's interpretation of the PSA is unworkable. Regarding his claim that Cindy was entitled to only the amount due to her on installment payments, James concedes that this would likely result in piecemeal

---

[3] James's claim that his right to sell marital assets superseded Cindy's right defies logic. James's interpretation would subordinate Cindy's interest to pursue the equalization payment, even once James had defaulted This would have compromised or defeated Cindy's security interest.

sales of the farm: "the trial could have authorized Cindy . . . to sell only a portion of [James's] real estate sufficient to pay the creditors and the amount actually owed to her." *James's Br.* at 22. This likely would have diminished the value of the farm, making it less certain that Cindy and creditors like Wells Fargo would be fully paid. Further, any proposed sale of the real estate was subject to the approval of Wells Fargo: "[T]he authority to sell the Real Estate granted to Cindy . . . herein is subject to the prior written approval by Wells Fargo of all terms and conditions of such sale, including, but not limited to, the method of sale and purchase price." *Appellant's App. Vol. 2* at 22. Piecemeal sales would have devalued the property; however, we will not speculate whether Wells Fargo would have approved such sales. Indeed, Wells Fargo indicated it would not approve James's proposed sale of 100 acres of the farm to neighboring farmers for $1,000,000.00 when its attorney stated: "My client has basically instructed me if we don't get paid off through this closing [with Rieth-Riley] we're simply just going to move forward and set the real estate for sheriff's sale and take care of ourselves and exercise the rights we need to." *Id.* at 105.

[32] By selling the real estate to Rieth-Riley, Cindy appears to have made the best of a bad situation. Though the real estate's appraised value was $1.56 million, she sold it for $1.63 million. *Id.* at 13, 104. Not only did the sale pay off Cindy, Wells Fargo and other creditors, it paid James $500,000.00. *Rieth-Riley Br.* at 12.

[33] The trial court did not err in finding that Cindy held a judgment lien against the farm and did not impermissibly modify the PSA by allowing Cindy to sell the farm to collect the full equalization payment.

### B. The Trial Court Properly Denied James's Request for Rescission

[34] James first argues that the trial court should have granted his request to rescind the sale of the farm to Rieth-Riley because the sale was based on the trial court's erroneous determination that Cindy had the right to sell the farm. James next argues that Rieth-Riley's ejectment action to remove him from the farm was not properly before the trial court because Rieth-Riley should have instituted a separate action instead of pursuing ejectment within the dissolution case. *See* Ind. Code § 32-30-2-1, *et seq.*

[35] Because we decided above that the order allowing Cindy to sell the farm was not erroneous, we reject James's argument that the sale to Rieth-Riley should be rescinded. We also reject his claim that the ejectment action was not properly before the trial court. Indiana Trial Rule 24 allows a litigant to intervene as a matter of right when disposition of a matter may impair the litigant's interest in the property. Here, when James asked the trial court to rescind the sale of the farm, he necessarily threatened Rieth-Riley's interest in the farm, allowing Rieth-Riley to intervene as a matter of right and to pursue its rights and remedies within the existing case.

[36] Further, allowing Rieth-Riley to seek ejectment and possession within the existing case served judicial economy. During the hearing on James's motion

to correct error, James's attorney conceded this during the following colloquy with the trial court:

> THE COURT: Why don't we talk about that. And I read through the motion to strike, which I find to – it's an interesting argument, and I guess, Mr. Masters, maybe you can help by answering this question for me. Other than the other branches of government that collect a portion of the filing fee, is there any real harm to having the immediate possession and perhaps final - or the ejectment heard in this case as opposed to filing a new action?
>
> MR. MASTERS: Well, if you put it to me in those terms, is there any harm. I suppose there's no harm. In all candor to the Court, I would say there's probably a certain efficiency in having us all here.

*Appellee Rieth-Riley App. Vol. 2* at 113-14.

[37] Moments later, James's attorney again conceded that allowing Rieth-Riley's ejectment to proceed within the existing case would serve judicial economy:

> MR. MASTERS: And so, I have to tell you, you know, we've all been around for a while, and I assumed that's where we'd end up is right back here anyway, even if there was a separate cause of action filed.

*Id.* at 116. In *Fultz v. Cox*, 574 N.E.2d 956, 959 (Ind. Ct. App. 1991), we held that when deciding whether to consolidate cases, a trial court should balance the interests of convenience and judicial economy against the likelihood of substantial prejudice to a defendant's case. Here, James concedes there was no

prejudice in letting the ejectment matter proceed in the dissolution case. Therefore, allowing the ejectment case to proceed within the dissolution case served judicial economy, did not prejudice James, and thus was not an abuse of discretion. *Cf. Emerick v. Miller*, 159 Ind. 317, 64 N.E. 28, 30 (1902) ("[I]t would be a useless and vexatious course to require the purchaser to obtain such possession by another suit."). Accordingly, the trial court did not abuse its discretion in allowing Rieth-Riley to intervene to protect its interests in the farm with an ejectment and possession action.

[38] Finally, we agree with Rieth-Riley that because rescission is an equitable remedy, it is not available to parties like James who are in default. Under the "clean hands" doctrine, one who seeks equity must be free of wrongdoing before the court. *Fairway Developers, Inc. v. Marcum*, 832 N.E.2d 581, 584 (Ind. Ct. App. 2005), *trans. denied*. For the doctrine to apply, the party must be guilty of intentional misconduct. *Foursquare Tabernacle Church of God in Christ v. Dep't of Metro. Dev. of Consol. City of Indianapolis*, 630 N.E.2d 1381, 1385 (Ind. Ct. App. 1994). Here, James's wrongdoing and intentional conduct was clear; he never denied that he defaulted on his obligations under the PSA. In fact, in his motion to correct error he itemized the payments on which he had defaulted. *Appellant's App. Vol. 2* at 82-83. Therefore, James lacked the requisite clean hands to seek rescission, and the trial court did not abuse its discretion in denying James's request to rescind Cindy's sale of the farm to Rieth-Riley. *See Van Bibber Homes Sales v. Marlow*, 778 N.E.2d 852, 857 (Ind. Ct. App. 2002).

## II.    Adjudication of Rieth-Riley's Claim to Possess Farm

[39]    James argues that the trial court did not declare that Rieth-Riley had the right to possess the farm because the September 21, 2017 order only gave Cindy authority to sell the farm yet did not approve a specific buyer.  While it is true the order did not identify Rieth-Riley as the buyer, the record clearly demonstrates that the trial court declared that Rieth-Riley had the right to possess and own the property.  Once James asked the trial court to rescind the sale of the farm, Rieth-Riley quickly sought leave to intervene pursuant to Indiana Trial Rule 24 because it claimed an interest in the farm and that James's motion to rescind would impair its interests in the farm.  *Appellee Rieth-Riley's App. Vol. 2* at 21-26.  The same day Rieth-Riley also filed a motion for ejectment and immediate possession of the farm, contending that James wrongfully and unlawfully possessed the farm and that the trial court should order James to surrender the farm.  On March 14, 2018, the trial court granted Rieth-Riley's motion for ejectment and immediate possession.  It ruled that "[i]mmediate possession of the [farm] . . . is granted to Rieth Riley [and that James's] respective rights of possession are terminated[.]"  *Id.* at 70-71.  On March 20, 2018, Rieth-Riley filed an emergency motion for final judgment of possession, which the trial court granted on March 30, 2018.  *Id.* at 73; *Appellant's App. Vol. 2* at 46-48 ("Rieth-Riley's Motion for a Final Judgment of Possession pursuant to Ind. Code § 32-30-3-12 is GRANTED.").  Therefore, the trial court rendered a final adjudication of Rieth-Riley's right to possess the farm.

<h1 style="text-align: center;">Cindy's Cross Appeal</h1>

<h2 style="text-align: center;">I.    Trial Court Erred in Limiting Cindy's Recovery</h2>

[40]    Cindy contends that the trial court erred in granting James's motion to correct error with respect to the amount to which she was entitled upon James's default of the terms of the promissory note. While conceding that the promissory note does not contain an acceleration clause, she argues that the plain meaning of the PSA provides for an acceleration of the full amount due upon default of any term of the promissory note. Thus, she claims she is entitled to retain sale proceeds to satisfy the full amount of the promissory note.[4]

[41]    Earlier in this decision, we found that Cindy held a judgment lien against the farm and, thus, was entitled to sell the farm to get the full equalization payment. Therefore, we agree with Cindy that the trial court erred in ruling that she was entitled only to that amount of sales proceeds that would cover the amount James owed her at the time the sale of the farm to Rieth-Riley had closed. Cindy was entitled to the full amount of the equalization payment.

<h2 style="text-align: center;">II.    Cindy is Entitled to Remand for Attorney Fees</h2>

[42]    Cindy argues that she is entitled to attorney fees. She refers to the following language in the promissory note: "In the event of a default, Holder shall be entitled to recover reasonable attorneys' fees incurred in collection." *Appellant's*

---

[4] While the trial court limited the amount of sale proceeds that Cindy could keep, it appears that Cindy has received $383,123.09. *James's Br.* at 14, n.2; *Appellant's App. Vol. 2* at 52.

*App. Vol. 2* at 60. Because James defaulted, which required Cindy to initiate legal action to collect the amount due, Cindy argues that she is entitled to recover reasonable trial and appellate attorney fees. She asks us to remand the matter to the trial court for an evidentiary hearing on the issue. *See Bruno v. Wells Fargo Bank, N.A.*, 850 N.E.2d 940, 951 (Ind. Ct. App. 2006).

[43] We reject James's claim that because Cindy did not raise the issue of trial attorney fees in the proceeding below, she is not entitled to trial attorney fees, contending that the issue is *res judicata*. The Indiana Supreme Court has ruled that "[a] request for attorney fees almost by definition is not ripe for consideration until after the main event reaches an end. Entertaining such petitions post-judgment is virtually the norm.'" *Cavallo v. Allied Physicians of Michiana, LLC*, 42 N.E.3d 995, 1002-03 (Ind. Ct. App. 2015) (quoting *R.L. Turner Corp. v. Town of Brownsburg,* 963 N.E.2d 453, 460 (Ind. 2012)). Accordingly, we find that the matter of Cindy's trial attorney fees is not *res judicata*, and on remand the trial court shall determine the amount of trial and appellate attorney fees that James owes Cindy. *See Cole*, 713 N.E.2d at 905 n.4 (hearing on remand preferred procedure to determine reasonable attorney fees).

[44] Affirmed in part, reversed in part, and remanded.

Vaidik, C.J., and Riley, J., concur.